482 S.E.2d 605

**STATE of West Virginia, Plaintiff
Below, Appellee**

v.

**James L. CRABTREE, Defendant
Below, Appellant.**

No. 23408.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 17, 1996.

Decided Oct. 11, 1996.

Philip W. Morrison II, Special Prosecuting Attorney, Winfield, for Appellee.

Jerry Blair and Richard Vital, Huntington, for Appellant.

CLECKLEY, Justice:

The defendant below and appellant herein, James L. Crabtree, appeals his conviction for recidivism and the underlying convictions for malicious wounding and battery. The defendant contends the trial court committed several errors which justify reversal of the recidivism conviction and the malicious wounding and battery convictions.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Patsy Morrison was found severely beaten on the morning of June 24, 1993, at the Guyan boat docks in Huntington, West Virginia. Discovered next to her body was a bloody stick to which were attached pubic hairs later matched to the victim's. Based on Ms. Morrison's identification of the defendant as her assailant, the defendant was arrested and charged with malicious wounding and two counts of second degree sexual assault.[1]

Ms. Morrison testified at trial that the defendant was one of several people with whom she had been drinking on the evening of June 23, 1993. She further testified that the defendant's wife appeared at the boat docks several times over the course of several hours to try to persuade the defendant to go home. At about 11:15 or 11:30 p.m., the others in the group left, leaving the victim and the defendant alone. Shortly thereafter, the defendant's wife again arrived in her car and the defendant went to speak with her. Ms. Morrison testified that she decided to leave when she heard the defendant and his wife arguing. She testified additionally that as she walked away, she heard someone run up behind her and then heard the defendant say: "You son-of-a-bitches ain't getting by with this." The victim was then hit on the back of the head. According to her testimony, the victim had no memory of anything until the next morning when a police officer asked her who had beaten her.

The defendant's theory at trial was that he was on his way to the home his friend, Billy Joe Workman, at the time the crime was committed. This theory was actually the defendant's second alibi since he had originally told the police that he was at another friend's house, but later recanted this alibi after that friend admitted that the defendant had not been at her house on the night of the crime.

At the preliminary hearing Mr. Workman testified that the defendant woke him at his home at about 11:45 on June 23, 1993, and stayed at his house for about an hour and a half. The preliminary hearing statement of Mr. Workman was read into the record at trial, as he died before the trial. During a bench conference, the prosecutor informed the trial court and defense counsel that he would be calling Karen Spoor, the defendant's parole officer at the time the crime was committed, to say that Mr. Workman told her the defendant did not reach his house until 2:00 in the morning. The defendant objected to the introduction of Mr. Workman's statement to Ms. Spoor on the grounds that such statement was hearsay and because Mr. Workman was not available for cross-examination. The trial court ruled the statement was admissible and that a limiting instruction would be given to inform the jury that the testimony was offered for impeachment purposes only.[2]

Ms. Spoor testified on direct examination at trial that she spoke with Mr. Workman before his death to find out whether the defendant had visited him at his home, which would have been a violation of the defendant's parole. On cross-examination, the State elicited from Ms. Spoor that Mr. Work-

---

1. The indictment included two unrelated charges of uttering, which were severed from the charges leading to the convictions in this case.

2. The trial judge offered a limiting instruction immediately prior to closing arguments.

man told her that the defendant arrived at Mr. Workman's home between 2:00 and 2:30 the morning after the crime. On redirect, defense counsel asked Ms. Spoor if she was relying only on her memory of what Mr. Workman told her as to the time of the defendant's arrival at his home. She replied that her information had been corroborated by Paula Gardner, who was Mr. Workman's parole officer. Over defense counsel's objection, Ms. Spoor explained that Ms. Gardner told her that Mr. Workman said he went to bed at midnight and the defendant arrived at his house well after midnight.

During trial, defense counsel made a motion for the trial court to pay for independent forensic testing of the stick found next to the victim. The State contended that the stick was used as a weapon to sexually assault the victim, both anally and vaginally. Upon being apprised that the pubic hairs found on the stick had been matched to those of the victim by the West Virginia State Police forensic laboratory, the trial court denied the motion.

During jury deliberations, the trial judge received the following written question from the jury: "Will you differentiate between sexual assault, sexual abuse and battery for us?" The judge asked trial counsel if there were any objections to him going into the jury room and giving the jury the three instructions requested. Neither counsel objected, but defense counsel remarked he had never seen that procedure before used. The judge responded he would have the jury return to the courtroom if defense counsel preferred, but he did not want to inconvenience the jury and planned to take the court reporter with him to the jury room and have a transcript made. Defense counsel did not object to that procedure. Later the jury sent a second message requesting the same instructions be read to them again, to which there was again no objection. However, no record was made of the proceedings in the jury room between the judge and the jury.

The defendant was convicted of malicious wounding and one count of battery as a lesser included offense of one of the sexual assault counts. An information for recidivism was filed by the State charging that the defendant had been found guilty of four felony offenses: malicious wounding on August 31, 1994; malicious wounding on May 18, 1983; malicious wounding on April 19, 1982; and breaking and entering on June 19, 1980. The defendant moved to dismiss the information on the grounds that the convictions charged in paragraphs 2 and 3 of the information were under the same indictment and that paragraph 4 stated the defendant was convicted of breaking and entering when he was actually convicted of entering without breaking. The trial judge accepted the State's characterization of the error regarding the entering without breaking charge as a typographical error and allowed the State to orally amend the information to state the correct charge. The trial judge also allowed the two malicious wounding convictions, which arose from the same indictment, to be listed separately.

## II.

## DISCUSSION

The defendant challenges four of the trial court's rulings: (1) the admission of inadmissible hearsay as impeachment evidence; (2) the improper intrusion into the jury room; (3) the denial of the defendant's motion to have a State's exhibit forensically tested; and (4) the commission of both substantive and procedural errors in enhancing the defendant's sentence under the recidivist statute. We address these issues in turn.

### A.

#### *Admission of Hearsay Impeachment Evidence*

■ The defendant contends the trial court erred in admitting into evidence the testimony of Karen Spoor for the purpose of impeaching the preliminary hearing testimony of Billy Joe Workman, a defense witness who died prior to trial. First, the defendant argues the trial court improperly admitted Ms. Spoor's statement that Mr. Workman told her the defendant arrived at his home between 2:00 and 2:30 the morning after the crime rather than the earlier time of 11:45 p.m., to which Mr. Workman testified at the

preliminary hearing. The defendant contends that, because the State did not present this testimony at the preliminary hearing, it should not be allowed to do so at trial.

■ To the extent the trial court's admission of evidence was based upon an interpretation of a statute or West Virginia Rule of Evidence, our standard of review is plenary. *State v. Omechinski*, 196 W.Va. 41, 45, 468 S.E.2d 173, 177 (1996); *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995). Our review of a trial court's ruling to admit or exclude evidence if premised on a permissible view of the law, however, is only for an abuse of discretion. *Id.*

■ In Syllabus Point 2 of *State v. Hall*, 174 W.Va. 787, 329 S.E.2d 860 (1985), we stated:

"Prior trial testimony is admissible as an exception to the hearsay rule under Rule 804(b)(1) of the West Virginia Rules of Evidence. Therefore, impeachment by reason of an inconsistent statement is available under Rule 806 of the West Virginia Rules of Evidence."

Under Rule 806 of the Rules of Evidence, the credibility of the declarant of a hearsay statement may be attacked by any evidence which would be admissible for that purpose if the declarant had testified as a witness.[3] Mr. Workman's prior preliminary hearing statement was admissible as an exception to the hearsay rule under Rule 804(b)(1).[4] If Mr. Workman had testified at trial, his statement could have been attacked by extrinsic evidence of his prior inconsistent statement under Rule 613(b) of the Rules of Evidence.

Therefore, it was proper to allow impeachment of Mr. Workman's testimony with Ms. Spoor's testimony as to his inconsistent statement.

■ The defendant's argument that Ms. Spoor's statement should not have been admitted at trial because it was not presented at the preliminary hearing is without merit. In the case of a hearsay declarant who makes an out-of-court statement that is inconsistent with the hearsay statement that is introduced, evidence of the inconsistent statement is admissible without regard to the usual rule that requires an opportunity for the speaker to explain the earlier statement. As we have previously recognized, Rule 806 abolishes the foundation requirement for impeachment of an admitted hearsay statement: "The language of the rule makes it clear that 'a statement or conduct by the declarant at any time, inconsistent with his hearsay statement' is not subject to the traditional requirement of affording the declarant an opportunity to explain or deny the inconsistency." *State v. Hall*, 174 W.Va. at 792, 329 S.E.2d at 864–65.

■ The defendant next argues the trial court erred in admitting the testimony of Ms. Spoor as to Mr. Workman's corroborating statement to Paula Gardner regarding the time of the defendant's arrival at Mr. Workman's house on the night of the crime. While the defendant is correct in his assertion that neither Rule 805 nor Rule 806 allows inadmissible hearsay within hearsay for impeachment purposes, *see State v. Sutphin*, 195 W.Va. 551, 466 S.E.2d 402 (1995), we hold that in this instance the error was for-

---

3. Rule 806 of the West Virginia Rules of Evidence states:

"When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E) has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with his or her hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination."

4. Rule 804(b)(1) of the Rules of Evidence states:
"*Hearsay exceptions.*—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1) Former testimony.—Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

feited under the "invited error" doctrine. In other words, we find the hearsay evidence was either invited by or in response to questions by defense counsel. Where inadmissible evidence is introduced solely as a result of the rigorous examination of the complaining party, the error is deemed invited error. *State v. Hanson,* 181 W.Va. 353, 363, 382 S.E.2d 547, 557 (1989); *Fluharty v. Wimbush,* 172 W.Va. 134, 137, 304 S.E.2d 39, 42 (1983).

"Invited error" is a cardinal rule of appellate review applied to a wide range of conduct. It is a branch of the doctrine of waiver which prevents a party from inducing an inappropriate or erroneous response and then later seeking to profit from that error. The idea of invited error is not to make the evidence admissible but to protect principles underlying notions of judicial economy and integrity by allocating appropriate responsibility for the inducement of error. Having induced an error, a party in a normal case may not at a later stage of the trial use the error to set aside its immediate and adverse consequences. In Syllabus Point 1 of *State v. Compton,* 167 W.Va. 16, 277 S.E.2d 724 (1981), we stated:

> " 'An appellant or plaintiff in error will not be permitted to complain of error in the admission of evidence which he offered or elicited, and this is true even of a defendant in a criminal case.' Syl. pt. 2, *State v. Bowman,* 155 W.Va. 562, 184 S.E.2d 314 (1971)." [5]

The defendant argues the invited error doctrine applies only when the error is *caused* by a defendant. He claims that inadmissible hearsay was injected into the trial as the result of an unresponsive answer to his question. Of course, a witness should give responsive answers to questions, and answers that are not responsive may be stricken on motion of the examining party especially if the unresponsive answer contains inadmissible evidence. *See McCormick on Evidence* § 52 at 201 (John W. Strong

ed., 4th ed.1992). Thus, if the answer was unresponsive to the question, the defendant cannot be held accountable for the error. "Putting a question does not always mean a party opens the door to whatever subject the answer touches. Unresponsive answers, or those that are responsive but broader than the question, should not be viewed as the responsibility of the questioner." Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 1.4 at 15 (1995). On the other hand, a responsive answer, one that is reasonably within the scope of the question or one that does not volunteer matters that are not asked, even though prejudicial, should not be stricken as unresponsive. *See State v. Brannon,* 103 W.Va. 427, 137 S.E. 649 (1927). In the case *sub judice,* we do not believe the answer was unresponsive. The record indicates the following exchange between defense counsel and Ms. Spoor:

> "Q. Are you absolutely certain about the times that he gave you?
>
> "A. I am absolutely certain about the times he gave me.
>
> "Q. Did you make a written notation at the time he gave you those times?
>
> "A. No, I did not.
>
> "Q. Didn't—
>
> "A. No. And, no, I did not.
>
> "Q. So, you're just relying on your memory of the conversation; is that right?
>
> "A. Yes. I also talked with Ms. Gardner this morning and verified some information with her.
>
> "MR. BLAIR: Objection. Hearsay. Nonresponsive.
>
> "THE COURT: No. you asked the question about what she's basing this on, just her memory, and she's answering you that it isn't just her memory, what else she did. It's a fair answer, and I'm going to allow her to give it to the jury."

It seems clear to us that the answer given by the witness was not only reasonably foreseeable but was a fair response in that it

---

**5.** *State v. Harding,* 188 W.Va. 52, 55, 422 S.E.2d 619, 622 (1992); *State v. Harshbarger,* 170 W.Va. 401, 294 S.E.2d 254 (1982); *State v. Richey,* 171 W.Va. 342, 298 S.E.2d 879 (1982); *State v. McCormick,* 168 W.Va. 445, 290 S.E.2d 894 (1981); *Jennings v. Smith,* 165 W.Va. 791, 272 S.E.2d 229 (1980); *State v. McGee,* 160 W.Va. 1, 230 S.E.2d 832 (1976); *Chambers v. Smith,* 157 W.Va. 77, 198 S.E.2d 806 (1973).

gave completeness to the answer. Nevertheless, even had the witness not assumed the initiative by giving a complete answer, the State was free to bring this matter out in its reexamination of the witness.

■■■ The above discussion, however, does not end our appellate analysis. Deviation from the doctrine of invited error is permissible when application of the rule would result in a manifest injustice. *See Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826, 837 (1976); *Hormel v. Helvering,* 312 U.S. 552, 558, 61 S.Ct. 719, 722, 85 L.Ed. 1037, 1042 (1941). As the Fourth Circuit Court of Appeals said in *Wilson v. Lindler,* 995 F.2d 1256, 1262 (4th Cir.1993):

"However, the doctrine is not without exception. A court is required to reverse a conviction, despite the 'invited error' in 'exceptional circumstances.' *United States v. Schaff,* 948 F.2d 501, 506 (9th Cir.1991). To demonstrate exceptional circumstances, the party inviting the error must demonstrate that reversal 'is necessary to preserve the integrity of the judicial process or to prevent a miscarriage of justice.' " (Citations omitted).

■■■ In the appellate context, whether the circumstances of a particular case justify deviation from the normal rule is left largely to the discretion of the appellate court. However, we find no compelling reason to apply the exception. The circumstances of this case do not indicate that its application "is necessary to preserve the integrity of the judicial process or to prevent a miscarriage of justice." The weight of the evidence against the defendant was heavy. There was overwhelming identification evidence of the defendant by the victim and such evidence reduced the likelihood that this hearsay evidence substantially influenced the verdict.

### B.

### *Right of Accused to be Present at Critical Stages*

The defendant next argues the trial court committed plain error by twice going into the closed jury room during deliberations to respond to questions from the jury but failed to make a record of the proceedings, thus depriving the defendant of his constitutional right to be present at every critical stage of the proceedings. Before the judge entered the jury room, he asked defendant and the State if there were any objections to him doing so. Both stated they had no objection, although defense counsel remarked that he had never seen the procedure done that way. The judge added he would take the court reporter with him and make a record of the proceedings.[6] When the judge emerged from the jury room, he related to counsel what had transpired between him and the jury.[7] Later the jury requested the same

---

6. The following *in camera* colloquy took place before the judge entered the jury room the first time.

"THE COURT: I received a written question from the jury that says, 'Will you differentiate between sexual assault, sexual abuse and battery for us?' And I'm going to have this marked as Court's Exhibit 2 and placed in the permanent record. My sense is that without further ado, I should go in there and give them the three instructions regarding sexual assault, sexual abuse and battery that I gave earlier. Is there any objection [to] my doing that?

"MR. MORRISON: I don't remember the defense numbers, but that's State's No. 10, I think. And for the record, there's no objection from the State.

"THE COURT: Do you have any thoughts on that?

"MR. SPURLOCK: Your Honor, I've always before—we don't have any objection, but I've never seen the procedure done that way.

"THE COURT: Do you want them brought back out here and have it read out here, rather than me walk in there? I just didn't want to inconvenience them. I don't care. I'll bring them out here and read it to them again. It doesn't make any difference to me. They're all sitting in there. I just thought I would take the court reporter in there and read them.

"MR. SPURLOCK: Oh, that's fine, Your Honor. The court reporter is there—

"THE COURT: There will be a transcript of it.

"MR. SPURLOCK: Thank you. Thank you, Judge.

"THE COURT: If you want me to bring them out here, I will.

"MR. SPURLOCK: No, that's fine."

7. The following *in camera* proceeding took place when the judge emerged from the jury room:

"THE COURT: When I went into the jury room to read them the three instructions, the one on sexual assault, the one on sexual abuse and the one on battery, they indicated to me that they did not need to hear the one on

instructions be read to them again, and the judge again, without objection, entered the jury room to read the requested instructions. No record was made of the proceeding.[8]

The issue presented here is under what circumstances may a trial judge communicate with a deliberating jury without the defendant being present. Because this issue involves constitutional and rule analyses, we review this issue of law *de novo*. Section 14 of Article III of the West Virginia Constitution, as well as the Fifth and Sixth Amendments to the United States Constitution, establishes a criminal defendant's right to be present at all critical stages of a trial. In Syllabus Point 1 of *State ex rel. Redman v. Hedrick*, 185 W.Va. 709, 408 S.E.2d 659 (1991), we stated:

> " 'The defendant has a right under Article III, Section 14 of the *West Virginia Constitution* to be present at all critical stages in the criminal proceeding; and when he is not, the State is required to prove beyond a reasonable doubt that what transpired in his absence was harmless.' Syl. pt. 6, *State v. Boyd*, 160 W.Va. 234, 233 S.E.2d 710 (1977)."

*See also Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353, 356 (1970) (Sixth Amendment); *Snyder v. Massachusetts*, 291 U.S. 97, 106–08, 54 S.Ct. 330, 332–33, 78 L.Ed. 674, 678–79 (1934) (Fifth Amendment). This right to be present, however, is not absolute and can be waived by the voluntary action of the defendant. *Taylor v. United States*, 414 U.S. 17, 19–20, 94 S.Ct. 194, 195–96, 38 L.Ed.2d 174, 177–78 (1973) (per curiam). Similarly, Rule 43 of the West Virginia Rules of Criminal Procedure provides a defendant with a parallel right to be personally present at every stage of the trial. However, we have held repeatedly that Rule 43 violations can constitute harmless error. In Syllabus Point 3 of *State ex rel. Redman v. Hedrick, supra,* we held: "In a criminal proceeding, the defendant's absence at a critical stage of such proceeding is not reversible error where no possibility of prejudice to the defendant occurs."

The State concedes that the above constitutional and rule-based rights extend to the portion of the proceedings from which the defendant was personally absent. However, the State contends these rights were effectively waived by the defendant by his acquiescence in the trial court's *ex parte* communications with the jury. We conclude that the asserted violation of the defendant's right to be present was waived and that, even in the absence of a waiver, the error is harmless. We will first discuss why the error is harmless.

Our cases identify two sources of prejudice to a criminal defendant when a defendant is absent from a critical stage of a criminal trial: (a) the jury might draw an adverse inference from the defendant's absence, and (b) the defendant might have information necessary to the effective advocacy of his or her case. *See State v. Allen*, 193 W.Va. 172, 455 S.E.2d 541 (1994). We find no reasonable possibility that either type of prejudice existed here and, in the unlikely event the trial court erred, we find that error to be harmless. Regarding the possibility that the jury might have drawn an adverse inference, we note that neither party was present at the time the trial judge spoke

---

sexual assault again. What they needed was for me to read them the sexual abuse and the battery so they could determine the difference between those two things. So, I used my discretion and didn't read them. I asked them again at the end if they wanted the sexual assault, and they said they did not want to have that read to them again, but they did want sexual abuse and battery read, so I read the two defendant's instructions.

"MR. SPURLOCK: Thank you, Your Honor.
"MR. MORRISON: So, it was apparent from your conversation that they at least had some idea or understood about the first instruction? They just wanted to hear the others?
"THE COURT: Correct.
"MR. MORRISON: Thank you, Your Honor.
"THE COURT: That's what they said. And the only question they had about it was they asked me if I could define the word 'contact,' and I told them that contact had a common meaning, that contact meant contact. I couldn't tell them any more than that."

8. It is unclear from the record when the defendant was made aware that the proceedings between the judge and jury in the jury room were not recorded.

alone to the jury. If there was prejudice to the defendant, it was offset by the absence of the prosecutor. Given this fact, it is difficult to believe the jury even considered the defendant's absence, much less drew an adverse inference therefrom.

Regarding the second possible source of prejudice, we are not told of nor do we perceive any possibility that the defendant could have aided the trial judge in reading the jury instructions, which apparently was done twice.[9] We realize the State's burden of proving harmlessness in such circumstances is an onerous one, and we are especially wary of labeling such an error harmless when the absence at issue involves *ex parte* communications with a deliberating jury. Nevertheless, our cases establish that no per se rule requires us to reverse,[10] and our review of the record convinces us that no reasonable possibility exists that the defendant's absence contributed in any way to the jury's verdict.

■■■ More importantly, we find any asserted constitutional and rule-based violations have been waived. Rule 43(a) requires trial courts to disclose communications with jurors and provide the defendant with an opportunity to be heard prior to responding to the communications. *Rogers v. United States*, 422 U.S. 35, 39, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1, 6 (1975). At the time the trial court informed the parties of the communication and advised them of his plan to communicate with the jury alone, the defendant failed to raise an objection, but specifically said he had no objection to the procedure. Nevertheless the defendant now insists the error should be corrected under our plain error doctrine. Our consideration of this issue is controlled by *State v. Miller*, 194

W.Va. 3, 459 S.E.2d 114 (1995). Under *Miller*, plain error is only available to correct error if the error was not waived. Thus, we must first determine whether the error was waived or forfeited.

■■■ In adopting the United States Supreme Court's definition of "plain error" as set forth in *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), *Miller*, 194 W.Va. at 18, 459 S.E.2d at 129, makes clear the demarcating line between "waiver" and "forfeiture" and the legal significance of each:

> "[T]he first inquiry under [Rule 52(b) of the West Virginia Rules of Criminal Procedure] is whether there has in fact been error at all.... [D]eviation from a rule of law is error unless there is a waiver. Waiver ... is the ' "intentional relinquishment or abandonment of a known right." ' ... [W]hen there has been such a knowing waiver, there is no error and the inquiry as to the effect of the deviation from a rule of law need not be determined."

Thus, under *Miller*, this Court does not proceed to determine the impact of the asserted error until there is a determination of waiver. On the other hand, only if this Court finds that a "forfeiture" has occurred, is plain error analysis applicable. Recently, in *United States v. Tipton*, 90 F.3d 861, 873 (4th Cir. 1996), the Fourth Circuit Court of Appeals elaborated on the distinction:

> "But even where a right has not been waived, any entitlement to have error in its denial or abridgement corrected on appellate review may be forfeited by the 'failure to make timely assertion of [the] right' at trial. Such a forfeiture does not, as does waiver, extinguish the error, but it does impose stringent limitations, embodied in

9. The instructions read to the jury were only those relating to the lesser included offenses of sexual abuse and battery under the second degree sexual assault counts. The defendant was found not guilty of one count of sexual assault and guilty of misdemeanor battery on the other. Neither of these relates to the malicious wounding verdict upon which the recidivist case was predicated. Without any allegation by the defendant that something else happened in the jury room which affected the outcome of the case, we must hold the trial judge's unilateral discussions with the jury were not reversible error.

10. Unquestionably, the trial judge acts at his or her peril when he or she conducts *ex parte* communications with a deliberating jury. To be certain there may be circumstances where this type of communication would create a presumption of prejudice. But not every *ex parte* communication will have that effect and, as the circumstances of this case demonstrate, some violations simply are not prejudicial.

Rule 52(b), on the power of appellate courts to correct the error."

When a right is waived, it is not reviewable even for plain error. By contrast, the simple failure to assert a right by not objecting—forfeiture—is distinct from an intentional relinquishment—waiver. Only a forfeiture is reviewable under plain error. *See United States v. David,* 83 F.3d 638, 641 n. 5 (4th Cir.1996) ("[t]he important distinction between forfeiture and waiver is that if a defendant waives a right (which is waivable), he cannot later raise an objection on the grounds that the failure to provide him with the waived right is error").

Any reasonable application of *Miller* clearly shows that we are dealing with a waiver. The defendant voluntarily relinquished any right he had regarding his presence at the time the trial judge communicated with the jury. The defendant affirmatively approved the trial judge's request that he be permitted to engage in discussions with the jury without the defendant being present. We believe this is a perfect case of waiver and, under our analysis in *Miller,* we need go no further.

### C.

#### Forensic Testing of Weapon

The defendant next contends the trial court erred in denying his motion for an inspection by his own expert of a critical piece of the State's evidence. State's Exhibit No. 12, a stick, was offered in evidence as the instrument used by the defendant to commit the sexual assault. The evidence indicated pubic hairs of the victim were found on the stick. Approximately thirty days before trial, the defendant moved the trial court for permission to have his own forensic examination conducted of the exhibit. For reasons not fully explained, the trial court initially denied the motion. The transcript reveals the following:

"MR. BLAIR [counsel for the defendant]: ... I would like some residue testing of that stick for mucous and epithelial tissue, things of that nature, have somebody from a forensics lab look at it. I have spoken with counsel about that and he intends to oppose that motion.

"MR. MORRISON [Special Prosecutor]: I do, Your Honor. If I recall correctly, there have been a number of medical reports submitted to the defense through the process of discovery, and I was checking with my officer, and it's our collective memory that the blood identified on all items, clothes, stick, everything, matched up serologically with the victim's blood. And there's never been an allegation that any of Mr. Crabtree's bodily fluids would be on this stick. I fail to see how—why this motion should be granted. It's going to put the Court to a great amount of suspense [sic]. It's not going to do anything for the trial of the matter.

"MR. BLAIR: Well, Your Honor, I think if they're—she's not going to be able to testify that a stick was used on her. The only thing we have is, we have a wooden splinter that supposedly caused a blister—not a blister, a—what's the term? I'm sorry. But that's the only evidence that the stick actually penetrated this woman's body, is that the splinter caused an abscess—that's the word—an abscess to form. We don't know that it was this stick. We don't know that it actually happened. I'm not sure that an abscess can form between the time that she was supposedly assaulted and the time that she went to the emergency room. I'm not sure an abscess can form in that amount of time. We feel like showing this large stick to the jury would be extremely prejudicial unless there's some kind of hookup between the victim, since she can't testify to it, and the stick.

"THE COURT: Mr. Morrison, you-all have the advantage on me. I really don't know what the evidence is here. So, you're going to have to tell me what is your evidence that's going to connect this stick to this crime.

"MR. MORRISON: Dr. Thomas, Your Honor, at the St. Mary's Hospital, the doctor that was on call at the emergency room, indicated to me by letter, which I have given to counsel and on the phone, that there was a lesion on the anal verge of the victim, which he originally thought might be a hemorrhoid, but because it

subsequently spontaneously drained, as he put it, purulent fluid, it could not have been a hemorrhoid. And it was his opinion that it was caused by this weapon, blunt force trauma to the anal verge.

"COURT: But I mean, how do you tie that to this particular stick?

"MR. MORRISON: This stick has one of the victim's pubic hairs attached to the end of it.

"THE COURT: That explains it, then.

"MR. MORRISON: Along with a lot of her blood, Your Honor.

"COURT: I'm going to deny your motion for further testing as of this time.

The State contends the proposed forensic examination of the stick would not have revealed anything of a probative nature for the defendant and the stick was used by the State only for the limited purpose of connecting the stick with the victim through her pubic hairs. Although we agree with the State as to the limited use of the stick, the record is not adequate for us to conclude the stick would have revealed nothing exculpatory.

■ Rule 16(a)(1)(C) of the West Virginia Rules of Criminal Procedure requires: "Upon request of the defendant, the state shall permit the defendant to inspect ... tangible objects ... which are material to the preparation of the defense[.]" In *United States v. Armstrong*, — U.S. —, —, 116 S.Ct. 1480, 1485, 134 L.Ed.2d 687, 697 (1996), the Supreme Court suggested: " '[T]he defendant's defense' means the defendant's response to the [State's] case-in-chief." Moreover, a plethora of cases suggest the right of inspection includes the right to have the defendant's own expert examine the State's tangible evidence. *See, e.g., United States v. Vaughn*, 736 F.2d 665, 666 (11th Cir.1984), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989); *United States v. Gaultney*, 606 F.2d 540, 545 (5th Cir.1979), *rev'd on other grounds sub nom.; Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *United States v. Sullivan*, 578 F.2d 121, 124 (5th Cir.1978). In *Gaultney*, 606 F.2d at 545, the court stated:

" 'Fundamental fairness is violated when a criminal defendant on trial for his liberty is denied the opportunity to have an expert of his choosing, bound by appropriate safeguards imposed by the Court, examine a piece of critical evidence whose nature is subject to varying expert opinion.' " (*Quoting Barnard v. Henderson*, 514 F.2d 744, 746 (5th Cir.1975)).

In the seminal article on the subject of the right to test, Professor Giannelli states:

"Discovery should include the right to test and retest evidence previously analyzed by prosecution experts. This right is recognized explicitly in the discovery rules of some jurisdictions. In other jurisdictions, the right to retest is implied from discovery rules that permit the inspection of tangible evidence, such as Rule 16." Paul C. Giannelli, *Criminal Discovery, Scientific Evidence, and DNA*, 44 Vand. L.Rev. 791, 816 (1991). (Footnotes omitted).

We find the reasoning of the above authorities compelling and, therefore, hold that a concomitant part of the examination or inspection under Rule 16 of the Rules of Criminal Procedure includes the right of the defendant to have an independent forensic analysis performed on evidence the State contends was used or possessed by the defendant at the time of the commission of the crime.

■ Earlier West Virginia cases are in general agreement. Beginning with the case of *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972), and followed by *State v. Harr*, 156 W.Va. 492, 194 S.E.2d 652 (1973), and *State v. Adkins*, 167 W.Va. 626, 280 S.E.2d 293 (1981), we succinctly have held that a criminal defendant is entitled to examine evidence that is to be introduced by the State. Specifically, Syllabus Point 3 of *Smith* states: "A person charged with possession of an illegal drug should be permitted to examine the alleged illegal drug under proper supervision and control." Of course, the right to expert examination can and should be controlled by the trial court. We believe the appropriate procedure for such testing was adequately spelled out in *State v. Faraone*, 425 A.2d 523, 526.(R.I.1981):

"A defendant who desires to analyze an article or substance should file a motion

setting forth the circumstances of the proposed analysis, the identity of the expert who will conduct such analysis, [the expert's] qualifications, and scientific background. The court may then, in its discretion, provide for appropriate safeguards, including, where necessary, the performance of such tests at the state laboratory under the supervision of the state's analyst."

■ Although we do not recognize an absolute right to analyze evidence, a motion in compliance with the above prerequisites should be denied only in cases where the trial court is satisfied that the motion is not timely made or is made in bad faith. The opportunity to examine and analyze evidence "should not be conditioned on a preliminary showing that a [test or] retest is critical or will be favorable." *Criminal Discovery, Scientific Evidence, and DNA*, 44 Vand. L.Rev. 791, 818 (1991). Obviously, the defense cannot know whether the results will be favorable until the examination is conducted.

■ We believe the trial court was wrong initially in denying the motion without giving the defendant a further opportunity to develop the record; however, the error was cured by the trial court's subsequent reconsideration of the motion. During a pretrial hearing held on August 4, 1994, counsel for the defendant again raised the issue of forensic testing of the State's Exhibit 12. After hearing full arguments on the issue and over the objection of the State, the following transpired:

"MR. SPURLOCK: May we, Your Honor, be permitted to hire a forensic expert?

"THE COURT: Sure.

"MR. SPURLOCK: And get back to the Court with the costs of same?

"THE COURT: The trial is August the 29th.

"MR. SPURLOCK: I understand.

"THE COURT: You're [*sic*] defendant is insisting on a trial this term of court.

"MR. SPURLOCK: I understand.

"MR. MORRISON: Your Honor, if they would, I would appreciate knowing the name and location of the expert.

"THE COURT: That's legitimate."

The record does not reflect what was later done by way of forensic testing; however, no further issue on the subject was preserved for appellate review. To be clear, we would not hesitate to reverse and remand for further proceedings had the trial court's initial ruling stood without change. We do not believe, however, under the circumstances of this case and the record presented to us on this appeal that it is necessary to reverse the conviction. Rather, consistent with our earlier cases, we find any error in this case has been cured and the defendant has failed to demonstrate any further error regarding this assignment.

### D.

### *The Recidivist Proceedings*

The defendant argues finally that the trial court erred by allowing the State to amend its information for recidivism during the proceedings for recidivism and that the trial court erred in allowing the defendant to be convicted of recidivism under an information alleging two separate felonies arising from the same indictment. This assignment of error need not detain us long. We find the amendment to the recidivist information was not an abuse of the trial court's discretion and the error in allowing the jury to consider two separate felonies arising from one indictment was harmless.

■ The defendant contends that amending "breaking and entering" to "entering without breaking" is a material change and therefore only could be made in the same term as the last felony conviction relied upon for the information. The defendant relies on Syllabus Point 1 of *State v. Cain*, 178 W.Va. 353, 359 S.E.2d 581 (1987):

"A person convicted of a felony may not be sentenced pursuant to W. Va.Code, 61–11–18, –19 [1943], unless a recidivist information and any or all material amendments thereto as to the person's prior conviction or convictions are filed by the prosecuting attorney with the court before expiration of the term at which such person was convicted, so that such person is confronted with the facts charged in the entire information, including any or all

material amendments thereto. *W. Va. Code*, 61–11–19 [1943]."

In *Cain*, the amendment charged the defendant with an additional offense with which he had not been confronted during the term of court at which he was convicted. The Court found that to hold that a prosecuting attorney may file amendments to the information subsequent to the term at which the defendant was convicted would deprive the defendant of his right to confront all the charges against him, particularly when the sole reason for the amendment is to add another offense. In this case, there was no new offense added, but the listed offense of "breaking and entering" was merely changed to reflect the correct conviction of the lesser offense of "entering without breaking." The prosecutor stated the mistake was a typographical error, and the trial judge accepted that explanation, finding it was not a material change.

In addition, the trial judge found that copies of the convictions were attached to the information provided to the defendant and, therefore, the defendant had notice that it was a typographical error. Thus, there was no element of surprise to the defendant when the error was corrected and the defendant was not prejudiced by the change.

The defendant argues the trial court erred by allowing him to be convicted of recidivism under an information alleging two separate felonies that arose from the same indictment. In paragraph 2 of the information, the defendant is charged with having been convicted of malicious wounding in Count I of Felony Case No. 82–C–37 and in paragraph 3 he is charged with having been convicted of the same charge in Count II of the same case. The defendant is correct that

these convictions cannot be counted separately in order to impose a recidivist sentence upon him. In the Syllabus of *State v. McMannis*, 161 W.Va. 437, 242 S.E.2d 571 (1978), we stated:

"Where a prisoner being proceeded against under the habitual criminal statute remains silent or says he is not the same person who was previously convicted and sentenced to the penitentiary offense or offenses alleged in the information, a circuit court has no jurisdiction to impose an enhanced sentence under the statute where the State fails to prove beyond a reasonable doubt that each penitentiary offense, including the principal penitentiary offense, was committed subsequent to each preceding conviction and sentence. W. Va.Code §§ 61–11–18, 19."

As we noted in *McMannis*, the public policy of deterrence underlying the recidivist statute requires the alleged convictions (except the first) be for offenses committed after each preceding conviction and sentence. In the current case, it is impossible for the conviction in paragraph 3 to have been committed after the conviction and sentence in paragraph 2 since each charge was brought under the same indictment. Therefore, it would have been improper to base a recidivist sentence on those two charges as separate convictions. However, the information included four separate convictions, including the two in paragraphs 2 and 3. Even if the malicious wounding charges in paragraphs 2 and 3 were counted as one conviction, there would have been the necessary three felony convictions in the information on which the jury based its recidivist conviction. Therefore any error was harmless.[11]

11. In a hearing after the trial to address the defendant's motion to request the trial court to reconsider its previous rulings or to grant a new trial or a judgment of innocence notwithstanding the jury's verdict of guilty, the trial court ruled as follows:

"The prosecuting attorney must show that he had two prior separate felonies prior to the commission of this felony in order to invoke the full effect of the recidivist statute, because the jury could have found that Mr. Crabtree was the person on one of those indictments and was not the person on the other, the

prosecutor had the right to present both of those.

"I indicated to you that in the event that they found him not guilty on the one that was not related to that, that is that he was not that person, and that he was the person on both of these, that I would count that as only one felony for purpose of the recidivist statute, but I do believe the prosecutor has the right to present all prior felonies in the event that they would have found him to have been the person on one of those and not been the person on the other, but that I was going to treat them as you

## IIL

## CONCLUSION

For the foregoing reasons, the judgment of the Circuit Court of Cabell County is affirmed.

Affirmed.

correctly, I think, interpret the recidivist statute, as simply one felony. That is the prosecutor will only be allowed to count one of the two.

"In this case, the jury found him on two of those, but I am only considering it as one prior felony because of the logic that you bring up. I think you're exactly right about that."